## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 25 2018, 9:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gregg S. Theobald
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of:<br><br>C.A. (Minor Child)<br><br>and<br><br>M.A. (Father),<br><br>*Appellant-Respondent,*<br><br>   *v.*<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | January 25, 2018<br><br>Court of Appeals Case No. 79A05-1708-JT-2066<br><br>Appeal from the Tippecanoe Superior Court<br><br>The Honorable Faith A. Graham, Judge<br><br>Trial Court Cause No. 79D03-1701-JT-4 |

**Bradford, Judge.**

# Case Summary

[1] In September of 2015, C.A. ("Child") was born to Appellant-Respondent M.A. ("Father") and W.B. ("Mother")[1] (collectively, "Parents"). Child tested positive for illegal drugs and Appellee-Petitioner the Indiana Department of Child Services ("DCS") became involved. Child was removed from Parents' care and placed with foster parents, where he remains. In November of 2015, the juvenile court found Child to be a child in need of services ("CHINS") and ordered Father to participate in parenting services; complete parenting, substance-abuse, and mental-health assessments; follow all recommendations from each assessment; submit to random drug screens; and participate in visitation with Child.

[2] Over the course of the next year, Father's compliance with the juvenile court's order was sporadic, at best. Father failed to complete parenting services, submit to any random drug screens after a positive result in September of 2016, consistently pursue treatment for his mental-health issues, or behave appropriately during visitation with Child. In January of 2017, DCS filed a petition to terminate Parents' parental rights in Child ("TPR petition"). Following a two-day evidentiary hearing, the juvenile court granted the TPR petition. Father contends that the juvenile court erred in concluding that DCS

---

[1] Mother does not participate in this appeal.

produced sufficient evidence to sustain a termination of his parental rights in Child. Because we disagree, we affirm.

# Facts and Procedural History

[3]     On September 4, 2015, Child was born drug-positive, suffered from withdrawal symptoms, and received intensive care for a few days. Mother also tested positive for illegal and non-prescribed substances, and Father admitted to drug abuse. Because of Parents' chronic mental-health and substance-abuse issues, they were already being assisted by the Assertive Community Treatment program ("ACT"). On September 8, 2015, DCS began its investigation of Child.

[4]     When DCS began investigating, Father threatened the assessment worker. At the hospital, Father spoke about unrelated topics, such as his political affiliation, how DCS workers could only work in one county, and Kentucky CPS. Father also explained that the reason for the September 11, 2001, attacks was that the United States bombed Pearl Harbor. Father did not know how to hold Child and was unemployed and homeless at the time. On September 14, 2015, DCS requested removal of Child from Parents' care, which request was granted. Child was placed in foster care, where he remains. Bauer Family Resources ("Bauer") became involved with the case on October 19, 2015.

[5]     On November 9, 2015, the juvenile court found Child to be a CHINS, finding, *inter alia*, that Father was in need of treatment for his mental health and

substance abuse issues and had no income or housing. On December 7, 2015, the juvenile court ordered Father to participate in Fatherhood Engagement Services through Bauer; complete parenting, substance-abuse, and mental-health assessments; follow all recommendations from each assessment; submit to random drug screens; and participate in visitation with Child. On January 9, 2017, DCS petitioned to terminate Parents' rights in Child. On March 22 and May 11, 2017, the juvenile court conducted a two-day evidentiary hearing on the TPR petition, during which it heard evidence regarding Father's compliance with its order of December 7, 2015.

[6] Father contacted Bauer in November of 2015 but ceased participation in Fatherhood Engagement programs at some point around August of 2016, having failed to accomplish any parenting-skills training. The counselor indicated that Father was challenging to work with because of his variability of mood, low cognitive function, and inability to focus. Father eventually stopped working with Fatherhood Engagement because he felt that the counselor had a bad attitude and did not give Father a bed or clothing for Child.

[7] On November 16, 2015, Father completed a substance-abuse assessment conducted by clinical psychologist Jeff Vanderwater-Piercy, Ph.D., H.S.P. Father exhibited disorganized thought during intake; although he had divorced Mother, he still referred to her as his wife and believed that the State should recognize them as married because they have a child together. Father initially said that he had other children but later said that he was a first-time father. Father alleged that the ACT team had fed illegal drugs to Mother before Child's

birth. When asked about having friends, Father said, "I don't want any close friends, close friends are your enemies but since you are twisting my arm I guess President Obama is my support because he is for the people." Ex. Vol. II p. 151.

[8] Dr. Vanderwater-Piercy diagnosed Father with marijuana use disorder in early remission and methamphetamine use disorder in sustained remission. Dr. Vanderwater-Piercy recommended a full psychological assessment, individual counseling to process feelings and explore behaviors and choices, case management, and that all visits with Child be supervised to ensure that Child's needs are met and that he is safe. Dr. Vanderwater-Piercy also recommended that Father attend at least two narcotics anonymous ("NA") and/or alcoholics anonymous ("AA") meetings per week and participate in random urine screens to monitor his sobriety.

[9] Dr. Vanderwater-Piercy also completed Father's psychological evaluation on February 3, 2016, and diagnosed Father with moderate, persistent depressive disorder with anxious distress; unspecified delusional disorder; alcohol use disorder in sustained remission; marijuana use disorder in early remission; antisocial personality disorder; and borderline intellectual functioning. These conditions caused Dr. Vanderwater-Piercy to have significant concerns about Father's ability to adequately parent Child without ongoing intervention and assistance. The report termed Father's conditions "significant" and raised concerns about Father's violent behavior. Ex. Vol. II p. 224.

[10] As for visitation, Father had supervised visitation with Child beginning in September of 2015, for three hours each week, usually divided into two sessions. At times, the visitation supervisor needed to redirect Father to what would be appropriate food for Child during visits. Jolene Todd, from Wabash Valley Alliance ("Wabash") testified that Father was, at times, very controlling and verbally aggressive. (Tr. 29). Father did not understand Child's developmental stages. Father struggled to be patient with Child when he cried or when changing a diaper because Child wiggled.

[11] Father also struggled to retain instructions on parenting skills. In November of 2016, despite numerous reminders, Father tried to leave Child behind, unsupervised, in the visitation room when he went to use the kitchen. Lauren Schneider, also from Wabash, testified that Father struggled to understand Child's social clues for when he needed changing, food, or attention. Father showed belligerent behaviors and would need to be redirected, and one visit was cancelled because of Father's anger. Father appeared to be under the influence of illegal substances during some visits. On four occasions early in 2017, Father did not attend scheduled visitation with Child.

[12] Father was not compliant with the drug screening ordered by the juvenile court and as recommended by the substance-abuse assessment. Father was frequently contacted to submit urine for screening, but rarely did. After testing positive for methamphetamine around September of 2016, Father failed to submit to any further drug screens. Father testified that DCS should have given him a drug-screening schedule in advance. Father did not go to NA or AA meetings

because he believed they sold "spice" on the corner near where the meetings occurred. Tr. p. 107. Those who worked with Father often believed he was under the influence of illegal or non-prescribed substances.

[13] The juvenile court also heard evidence related to Father's current mental state and overall fitness to be a parent. Psychologist James Toth, Psy.D., H.S.P.P., had treated Father on two other occasions over the previous two to three years before reopening services on February 15, 2017. Dr. Toth testified that Father has major depressive disorder with psychotic features and has troubles with mood stability and anger management. Father has difficulties with cognitive approaches to managing his moods and frustration or anger. Dr. Toth expressed concerns about Father parenting Child because of Father's mood instability. (Tr. 89). Dr. Toth felt that, because of Father having problems stabilizing his mood and his anger issues, "there is probably some concern" about Father parenting Child. Tr. p. 91. As of the second day of trial on May 11, 2017, Father had missed three of the six scheduled appointments since restarting treatment with Dr. Toth.

[14] Father also lacked the consistent means to financially provide for Child. Father had once worked for an awning company but was terminated because he had no driver's license. Although Father indicated that he had not been let go from any other job, he stated that "I've walked off before they had a chance to." Ex. Vol. II p. 219. Father has been unemployed since 2009. Father testified that he had resided with his mother for ten to fifteen years, while she paid the rent and

utilities. Father also testified that he worked three or four hours a week for ten dollars an hour and collected cans for cash.

[15] The juvenile court admitted exhibits indicating that Father has an extensive criminal history. Father indicated that he had a previous conviction for "sexual battery in which he received 10 years in jail" and evidence was admitted that Father accumulated twenty-three other charges in Tippecanoe county, including operating a vehicle with a suspended license, disorderly conduct, battery, resisting law enforcement, and public intoxication. Ex. Vol. II p. 153. On July 17, 2016, Father was arrested and charged with criminal trespass and intimidation and was incarcerated until September 14, 2016.

[16] DCS family case manager ("FCM") Sally Messmer testified that she has been involved in Child's case since September 4, 2015. FCM Massmer testified that the permanency plan for Child was adoption and that it was in his best interests to stay in his current foster-care placement, where he had been since removal. FCM Messmer testified that Child was "thriving" in his current placement, his needs were being met, and his needs would not be met were he to be returned to either Parent's care. Tr. Vol. II p. 54.

[17] On July 13, 2017, the juvenile court ordered the termination of Father's and Mother's parental rights in Child. The order provided, in part, as follows:

> 9. … Father had been unemployed since 2009 and was without housing.
>
> ….

18. Father is diagnosed with Persistent Depressive Disorder with Anxious Distress (Moderate), Delusional Disorder (Unspecified Type), Alcohol Use Disorder (In Sustained Remission), Marijuana Use Disorder (In Early Remission), Antisocial Personality Disorder, and Borderline Intellectual Functioning. Dr. Vanderwater-Piercy noted these diagnoses raise "significant concern regarding Father's ability to adequately parent a child over an extended period of time without ongoing intervention and assistance." Father has failed to demonstrate an investment utilizing the necessary assistance.

19. Father participated in case management services prior to incarceration. After release from incarceration, Father never reengaged in services. Father struggles with retaining information regarding safe parenting. Father made no progress toward becoming a primary custodian of the child. Father failed to commence therapy until February 2017 and still makes grandiose statements in sessions.

20. Father has a long-term history of substance use starting with alcohol at age twelve (12) and marijuana at age thirteen (13). A substance abuse assessment concluded with a diagnosis of Marijuana Use Disorder (In Early Remission) and Methamphetamine Use Disorder (In Sustained Remission). Father failed to submit to all requested drug screens and continues to actively use drugs.

21. Father's criminal history includes Criminal Deviant Conduct, Public Intoxication, Operating While Suspended, Resisting Law Enforcement, Battery and various other unknown misdemeanors and felonies. During the CHINS case, Father was arrested on July 7, 2016 for Trespass and Intimidation Father was released from incarceration on September 14, 2016.

22. Both parents have missed scheduled visits. Both parents have appeared at scheduled visits acting "odd" resulting in suspicion of being under the influence of a substance. Both parents struggle to catch social cues regarding the child's basic needs and must be directed regarding hunger and thirst. Both

parents have displayed belligerent and threatening behavior toward service providers. Neither parent has demonstrated an ability to provide for the child's basic needs.

23. The child is now nineteen (19) months old and has remained in the only home he has ever known. The child has thrived in placement and is developmentally on target. The child is bonded with the concurrent [sic] foster family. The child is adoptable even if the concurrent [sic] foster parents are unable to adopt for any reason.

….

CONCLUSIONS OF LAW

1. There is a reasonable probability the conditions that resulted in removal of the child from the home or the reasons for continued placement outside the home will not be remedied. There is no reasonable probability that either parent will be able to maintain stability to care and provide for the child.

2. Continuation of the parent-child relationships pose[] a threat to the well-being of the child. The child needs stability in life. The child needs parents with whom the child can form a permanent and lasting bond to provide for the child's emotional and psychological as well as physical well-being. The child's well-being would be threatened by keeping the child in parent-child relationships with either parent who are unable to meet their own needs let alone the needs of the child.

3. DCS has a satisfactory plan of adoption for the care and treatment of the child following termination of parental rights. The child can be adopted and there is reason to believe an appropriate permanent home has or can be found for the child.

4. For the foregoing reasons, it is in the best interests of [Child] that the parental rights of [Mother and Father] be terminated.

Order pp. 3–5.

# Discussion and Decision

[18]    The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

[19]    The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[20]    Father contends that the evidence presented during the evidentiary hearing was insufficient to support the juvenile court's order terminating his parental rights to Child. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term.*

*of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

[21] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[22] In order to involuntarily terminate Father's parental rights in Child, DCS must have established by clear and convincing evidence that:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> ….
>
> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> …
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[23] Father contends that DCS presented insufficient evidence to establish that (1) the conditions leading to the removal of Child would not be remedied, (2) continuation of the parent-child relationship posed a threat to Child, (3) termination was in Child's best interests, and (4) DCS has a satisfactory plan for the care and treatment of Child.

## I. Reasonable Probability that the Conditions Resulting in Continued Removal Would Not be Remedied

[24] Father contends that the record does not establish that the reasons for Child's continued removal would not be remedied.

> In determining whether "the conditions that resulted in the child's removal ... will not be remedied," *id.*, we "engage in a two-step analysis," [*K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1231 (Ind. Ct. App. 2013)]. First, we identify the conditions that led to removal; and second, we "determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quoting [*In re I.A.*, 934 N.E.2d 1127, 1134 (Ind. 2010)]) (internal quotation marks omitted). In the second step, the trial court must judge a parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions," *Bester v. Lake Cty.*

*Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005)—balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *K.T.K.*, 989 N.E.2d at 1231 (quoting *Bester*, 839 N.E.2d at 152) (internal quotation marks omitted). We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *See K.T.K.*, at 1234. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 642-43 (Ind. 2014) (footnote omitted).

[25] Here, the condition that led to Child's removal was that he tested positive for the presence of illegal drugs upon his birth. Since then, it seems clear that Child has not been returned to Father's care because of Father's lack of progress with his parenting skills, mental health, and substance abuse. The question is whether the record is sufficient to sustain a finding that these issues are unlikely to be remedied.

[26] Father never made significant progress in, much less successfully completed, Fatherhood Engagement Services. Father began in December of 2015 and ceased participation in around August or September of 2016, with no progress having been made on his treatment goals for at least a few months. In a September of 2016 report, Father's counselor recommended that Father be dismissed from Fatherhood Engagement and that Father had "made little progress toward any of his outlined goals." Ex. Vol. II p. 143. Father's counselor frequently noted Father's lack of engagement and indicated that

Father was a challenge to work with because of his variability of mood, low cognitive function, and inability to focus. Father eventually stopped working with Fatherhood Engagement because he felt that the counselor had a bad attitude and never gave Father a bed or clothing for Child. Father's failure to take advantage of the opportunity to improve his parenting skills supports an inference that this reason for continued removal will not be remedied.

[27] The record also contains little to suggest that Father will successfully address his serious and ongoing mental-health issues. Dr. Vanderwater-Piercy diagnosed Father with moderate, persistent depressive disorder with anxious distress; unspecified delusional disorder; alcohol use disorder in sustained remission; marijuana use disorder in early remission; antisocial personality disorder; and borderline intellectual functioning. Dr. Toth testified that Father has major depressive disorder with psychotic features and has troubles with mood stability and anger management. Father has difficulties with cognitive approaches to managing his moods and frustration or anger. During his evaluation with Dr. Vanderwater-Piercy, Father reported that he believed DCS had once brought the wrong baby to one of his visits. Father also expressed the belief that ISIS and the United States had developed the technology to make a person invisible and saw no reason that DCS would not use this technology against him.

[28] When tested for intellectual functioning, Father tested in the "low" category. Ex. Vol. II p. 223. Father's composite score for the Shipley-2 test of intellectual functioning was in the first percentile. Father attempted the MMPI-2-RF and

the MCMI-III to assess clinical symptoms, personality traits, and behavioral tendencies. Father's scores on the MMPI-2-RF were invalid due to excessively inconsistent answers. The results of the MCMI-III were reliable and showed high levels of anxiety and a tendency to be outwardly conforming and inwardly temperamental, edgy, suspicious, and mistrustful.

[29] Despite such serious mental-health issues, Father has shown little enthusiasm for addressing them. Father was born in 1969 and first saw a counselor when six or seven years old. In his thirties, Father saw a psychiatrist because of "angry outbursts" but did not follow through with treatment because he was uncomfortable with the medications prescribed. Ex. Vol II p. 222. Dr. Toth had treated Father previously and began seeing him again in February of 2017, the month before the termination hearing. As of the second day of trial on May 11, 2017, however, Father had missed three of the six scheduled appointments with Dr. Toth. Even assuming that Father *were* demonstrating a clear commitment to his counseling with Dr. Toth, "[i]t is a parent's habitual pattern of conduct that must be considered in determining whether to terminate parental rights, and a trial court is not required to accept evidence of a last-minute change in conditions as trumping evidence of years of a different pattern of behavior." *In re D.K.*, 968 N.E.2d 792, 799 (Ind. Ct. App. 2012). Given the evidence of Father's lack of commitment to addressing his serious mental-health issues, the record supports a conclusion that they will not be remedied.

[30] Finally, the record supports a conclusion that Father's issues with illegal drug use will not be remedied. There is evidence that Father's compliance with

court-ordered drug screening was, at best, sporadic before ceasing altogether in September of 2016, following a positive screen for methamphetamine. Although Father offers excuses for his refusal to submit to further screens or attend NA or AA meetings—also as ordered—a reasonable inference is that Father's illegal drug use continues unabated and unaddressed. Father has failed to establish error in the juvenile court's conclusion that the reasons for the continued placement of Child away from Father's care would not be remedied.

## II. Parent-Child Relationship Posed a Threat to Child

[31] Father also contends that the juvenile court erred in concluding that the continued parent-child relationship posed a threat to Child. Because we have already concluded that the juvenile court did not err in concluding that the conditions that led to the Children's removal would not likely be remedied, we need not address Father's argument in this regard. *See* Ind. Code § 31-35-2-4(b)(2)(B) (providing that DCS must establish that one the following is true: "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[, t]here is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child[, or t]he child has, on two (2) separate occasions, been adjudicated a child in need of services").

# III. Child's Best Interests

[32] We are mindful that in determining what is in the best interests of Child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the juvenile court must subordinate the interests of the parents to those of the child involved. *Id*. Furthermore, this court has previously determined that the testimony of a GAL regarding a child's need for permanency supports a finding that termination is in the child's best interests. *In the matter of Y.E.C.*, 534 N.E.2d 273, 276 (Ind. Ct. App. 1992).

[33] FCM testified that it was in Child's best interests to stay in his current placement, where he had been since removal. FCM Messmer testified that Child was "thriving" in his current placement, his needs were being met, and his needs would not be met were he to be returned to either Parent's care. Tr. Vol. II p. 54. Although this evidence alone is likely sufficient to sustain the juvenile court's finding that termination is in Child's best interests, s*ee, e.g.*, *In re T.F.*, 743 N.E.2d 766, 776 (Ind. Ct. App. 2001) (concluding that testimony of GAL and FCM was sufficient to sustain finding that termination was in the child's best interests), there is much more. We have already covered in detail the substantial evidence of Father's unaddressed substance abuse, unaddressed mental illness, history of criminal behavior, lack of parenting skills, lack of financial means to appropriately care for Child, and general instability. Given the positive evidence regarding Child's current placement and the negative

evidence regarding Father's ability to provide for Child's needs, Father has failed to establish error in this regard.

## IV. Satisfactory Plan for Child's Care and Treatment

[34] Finally, Father contends that the juvenile court's conclusion that DCS has a satisfactory plan for the placement of Child is unsupported by the record. "For a plan to be 'satisfactory,' for purposes of the statute, it 'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'" *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 374 (Ind. Ct. App. 2007) (quoting *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*), *trans. denied*. DCS's plan for continued placement with his foster family and eventual adoption (whether by them or somebody else) easily satisfies this test. Indeed, even if we assume that Child's current placement cannot become permanent, "(a)ttempting to find suitable parents to adopt [Child] is clearly a satisfactory plan." *Id.* at 375 (citing *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997)). Father has not established error in this regard.

[35] The judgment of the juvenile court is affirmed.

Robb, J., and Crone, J., concur.